**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| T.J. and C.M., *individually and on behalf of all others similarly situated*,<br><br>    Plaintiffs,<br>    v.<br><br>CROUSE HEALTH HOSPITAL, INC.,<br><br>    Defendant. | Case No.: 5:26-cv-1302 (FJS/ML)<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

1. Plaintiffs T.J. and C.M. all times relevant herein, were patients of Crouse Health Hospital, Inc. ("Crouse" or "Defendant"), and bring this class action against Defendant in their individual capacities and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions, their counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

2. Crouse Hospital is a hospital based in Syracuse, New York providing general medical care for both adults and children, emergency services, and 600,000 outpatients a year in a 16-county area spanning Northern and Central New York.[1]

3. Defendant is a HIPAA covered healthcare entity and thus its disclosure of health and medical communications is tightly regulated. The United States Department of Health and Human Services (HHS) has established "Standards for Privacy of Individually Identifiable Health

---

[1] *See* https://www.crouse.org/about/ (last visited June 24, 2026)

**CLASS ACTION COMPLAINT**

Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

4.      Defendant owns and controls www.crouse.org ("Defendant's Website" or the "Website"), which it encourages patients to use to obtain information about Defendant's services and providers, schedule appointments, fill out forms, access a patient portal, request information, and make payments.

5.      Included within Defendant's Website is a Patient Portal[2], which Defendant encourages its patients to use. The Patient Portal allows patients to log in, schedule appointments, complete or upload forms, request information, access health-related resources, and make payments.

6.      Plaintiffs bring this class action lawsuit to address Defendant's unlawful practice of disclosing Plaintiffs' and Class Members' confidential personally identifiable information ("PII"), protected health information ("PHI"), and confidential health communications ("CHC") (collectively referred to as "Private Information") to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook") and Google, Inc. ("Google"), without implied or expressed consent, through the use of tracking software that is embedded in Defendant's website. (Meta and Google will be collectively referred to as "Unauthorized Third-Party Marketers").

---

[2] Defendant's Patient Portal is accessible at https://mycrousechart.crouse.org/crouse/Authentication/Login? (last visited June 24, 2026)

**CLASS ACTION COMPLAINT**

7.      Although Plaintiffs are presently unaware of every type of pixel and tracking tool Defendant has implemented on its Website, the pre-suit investigation, including the review of the publicly available source-code and network-traffic information, revealed the presence of Meta and Google tools deployed on various sensitive pages of its Website, including the Portal. As used herein, Tracking Tools includes the Meta Pixel, Google Analytics 4, the Google Tag Manager, Google Ads / Display & Video 360, DoubleClick Floodlight, Google remarketing, and similar tools offered by Google in conjunction with its marketing products.

8.      The Tracking Tools specific purpose is to provide website owners with the ability to acquire the raw web user data and to then transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. The Tracking Tools are offered for "free" to companies like Defendant but require the website owner to share and disclose the web users valuable behavioral web browsing data with the Unauthorized Third-Party Marketer.

9.      To be sure, "data is the new oil of the digital economy,"[3] and Meta has built its more-than $300 billion market capitalization on mining and using that 'digital' oil. Google, and other ad tech companies are similarly motivated, with Google's online advertising business generated 42.4% of global digital ad revenues in 2023.[4]

10.      With the intent to monetize the patient information flowing through its Website, Defendant installed Tracking Tools from the Unauthorized Third-Party Marketers onto its Website, which provided Defendant with valuable marketing tools to create more efficient and profitable marketing campaigns.

---

[3]   Joris Toonders, *Data is the New Oil of the Digital Economy*, WIRED (July 16, 2014), https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/, available at https://www.linkedin.com/pulse/20140716110251-7386607-data-is-the-new-oil-of-the-digital-economy/.
[4]   *Global Digital Advertising Revenues – A Look at the Big Three*, VISIBLE ALPHA (May 17, 2023), https://visiblealpha.com/blog/global-digital-advertising-revenues-a-look-at-the-big-three-alphabet-googl-meta-platforms-meta-amazon-com-amzn/.

**CLASS ACTION COMPLAINT**

11.    In implementing the Tracking Tools, however, Defendant deprived Plaintiffs and Class Members of their privacy and property rights by: (1) surreptitiously tracking, recording, and aggregating Plaintiffs' and Class Members' confidential communications and Private Information; (2) causing Plaintiffs' and Class Members' communications to be disclosed and intercepted by Unauthorized Third-Party Marketers; (3) utilizing the Private Information for marketing purposes, and (4) converting and monetizing the Private Information through various marketing tactics, which upon information and belief, included, audience building, retargeting, geo-location, and other invasive marketing tactics. At no point along the data monetization process did Defendant obtain proper express written consent from Plaintiffs or Class Members for any of these tortious acts.

12.    Indeed, by deploying a combination of Facebook and Google tracking on its website, Defendant maximized the exposure of its patients' and prospective patients' health data to advertising ecosystems in order to gain the highest probability of converting new patients with the lowest cost per conversion of a new patient.

13.    Plaintiffs' and Class Members' browsing and behavioral data qualifies as PHI because the data (1) related to the past, present and future medical care of the patient and (2) the data was sent in combination with direct and indirect identifiers from which the Plaintiffs and Class Members could be reasonably associated with the data.

14.    Notably, the transmission of the Private Information was uniform for Plaintiffs and the Class Members and included explicit references to: (1) specific medical services and providers; (2) desired medical treatment or care; (3) desired locations or facilities where treatment was sought; (4) appointment scheduling and portal activity; (5) contact or information requests; and (6) bill-pay information.

15.    At a minimum, the information Crouse divulged to the Unauthorized Third Parties allowed the Unauthorized Third-Party Marketers to learn that specific individuals were patients

seeking or receiving treatment from Crouse and other medical providers. In and of itself, this data reveals the fact that an individual is being treated by Crouse and has received or will receive medical services in some capacity.

16.     Moreover, the Private Information collected and disclosed by Defendant's Tracking Tools is not anonymous. The Tracking Tools capture user-specific data that Google and Meta can use to identify the specific user through various cross-referencing and algorithmic methods, including persistent user IDs (e.g., fbp, cid, auid, and related advertising identifiers), and, upon information and belief, IP addresses and browser fingerprint data points.

17.     Google, for example, connects patient data from Defendant's Website to the individual patient's Google Account (cid) which is linked to his/her Google account and contains additional details about their identity. Google "stores users' logged-in identifier on non-Google websites … in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[5]

18.     Simply put, the health information disclosed through the Tracking Tools is personally identifiable health information and is the digital equivalent of disclosing a comprehensive patient list to Meta and Google.  Indeed, the Unauthorized Third Parties each offer

---

[5] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees). Google also connects user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates", HHS, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 29, 2023) ("Such PHI may include, for example, an individual's IP address . . .").

**CLASS ACTION COMPLAINT**

Tracking Tools free of charge,[6] but the price that Defendant paid was the intercepted patient data. Effectively, Defendant traded its patient list for access to the "free" marketing tools.

19.    To be sure, there are many analytics companies and marketing campaigns that are HIPAA compliant that would have prevented Defendant's tortious acts; but Defendant opted for known non-HIPAA compliant analytics and marketing tactics to take advantage of the free services and gain access to powerful analytics, audience building, and re-targeting tools.

20.    Indeed, the Office for Civil Rights at HHS has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online Tracking Tools.[7] The Bulletin expressly provides (in bold type) that "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.**" In other words, HHS has expressly stated that Crouse's implementation of Tracking Tools violates HIPAA Rules.

21.    The Federal Trade Commission (FTC) has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."

22.    Moreover, Crouse's Privacy Policy makes promises that it does not keep. Specifcially, it states: "We will not distribute information that identifies you individually or reveals

---

[6] *Facebook Pixel: What It Is and Why You Need It*, SEO DIGITAL GROUP, https://seodigitalgroup.com/facebook-pixel/ (last visited Aug. 26, 2025).

[7] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH & HUMAN SERV. (rev. June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

**CLASS ACTION COMPLAINT**

your identity ("identifying information") to any organization outside of the Crouse Hospital network. We will not make identifying information available publicly without the prior written or electronic consent of the individual identified."

23.    Plaintiffs and Class Members used the Website to request and book medical appointments, search for a medical provider, research medical conditions and treatments, contact a physician, review and request healthcare records, request prescription refills, sign up for classes or support groups, and pay medical bills.

24.    Patients simply do not anticipate that their trusted healthcare provider will send and trade their Private Information to social media and marketing companies for future exploitation and targeted marketing.

25.    Similarly, Crouse does not have a HIPAA-compliant Business Associate Agreement ("BAA") in place with any of the Unauthorized Third Parties to safeguard its patients Private Information, and these companies are publicly vocal that they will not enter into healthcare BAA agreements.

26.    In sum, through the use of Tracking Tools, Defendant intentionally transmitted Plaintiffs' and Class Members' highly sensitive communications and Private Information to Unauthorized Third Parties, including communications that contained private and confidential health information;  and further, Defendant utilized marketing tools and tactics with the intent of monetizing the Plaintiffs' and Class Members' highly sensitive communications and Private Information. Neither Plaintiffs nor any Class Member signed a written authorization permitting Crouse to disclose or use their Private Information for marketing purposes.

27.    As a direct and proximate result of Crouse's conduct, Plaintiffs and Class Members have suffered numerous harms and injuries, including invasion of privacy, breach of fiduciary

duty, breach of confidentiality, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy  and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

28.    Consequently, Plaintiffs individually and on behalf of the putative Class, bring this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiffs and the putative Class have suffered and seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), statutory damages, and in the alternative, nominal. Plaintiffs further seek restitution, disgorgement of profits or cost savings obtained from the improper use of the Private Information. Finally, Plaintiffs seek injunctive relief to address the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

29.    Plaintiffs bring causes of action for (1) breach of fiduciary duty/confidentiality; (2) violation of the Electronics Communication Privacy Act ("ECPA"), 18 U.S.C. § 2511(1) – unauthorized interception, use, and disclosure; (3) breach of implied contract; (4) unjust enrichment; (5) negligence; and (6) violation of the New York Consumer Law for Deceptive Acts and Practices Gen. Bus. Law § 349.

## JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different state than Crouse. This Court also

has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 2510, et seq. (the Electronic Communications Privacy Act).

31.    This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

32.    This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

33.    Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## THE PARTIES

34.    Plaintiff T.J. is an adult citizen and resident of the State of New York and is domiciled in Syracuse, New York where she intends to remain.

35.    Plaintiff C.M. is an adult citizen and resident of the State of New York and is domiciled in Syracuse, New York, where he intends to remain.

36.    Crouse Hospital, Inc. is a New York corporation with its headquarters and principal place of business in Syracuse, New York.

37.    Crouse provides medical care and related healthcare services to patients in and around Syracuse, New York. Crouse maintains an online presence through which patients and prospective patients can access information about providers and services, use patient resources, request information, schedule care, complete forms, access portal functions, and make payments.[8]

---

[8] https://crousemed.com/ .

**CLASS ACTION COMPLAINT**

## COMMON FACTUAL ALLEGATIONS

**i.     Underlying Web Technology**

38.     To understand Defendant's unlawful data-sharing and illicit marketing practices, it is important first to understand basic web design and tracking tools.

39.     Devices (such as computers, tablets, or smart phones) access web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

40.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

41.     Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.
- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.
- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.
- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[9]

42.     Every website is comprised of Markup and "Source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the

---

[9] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

**CLASS ACTION COMPLAINT**

web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

43. Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests that are invisibly executed in the background without notifying the person using the web browser. For example, the Tracking Tools in this case are snippets of code that Defendant embedded in its Source Code, thereby instructing the Website to send a second set of transmissions to Google's own web servers.

44. By contrast, the Markup is the façade of the website, and it is the only part that website visitors actually see when they access a website. As an example, a patient's HTTP Request seeks specific information from the Defendant's Website (e.g., "Find a Doctor" page), and the HTTP Response provides the requested information in the form of "Markup," forming the webpage's content and features.

45. Similarly, when a patient visits crouse.org and selects the "Pay a Hospital Bill" button, their web browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage, where the patient only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses.

### A. Tracking Tools

46. The Unauthorized Third-Party Marketers offer Tracking Tools as software that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user communications and activity on those platforms. The Tracking Tools are used to gather, identify, target, and market products and services to individuals.

**CLASS ACTION COMPLAINT**

47.    In general, Tracking Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's URL and metadata, button clicks, etc. Advertisers, such as Defendant, can track other user actions and communications and can create their own tracking parameters by customizing the software on their website, and configuring advanced matching tools that gather more sensitive and identifiable data from such sensitive parts of the Website as form submission.  Defendant is in exclusive control over what additional configurations were set to capture and share data over and beyond the standard settings – e.g., Meta advanced matching, which is commonly implemented to improve targeted audience marketing.

48.    When a user accesses a webpage that is hosting Tracking Tools, the user's communications with the host webpage are instantaneously and surreptitiously duplicated and sent to the third party, and that user's browsing information is then part of the marketing tactics.  Here, for example, the Meta Pixel and Google Analytics tool on Defendant's Website causes the user's web browser to instantaneously duplicate the contents of the communication with the Website and send the duplicate from the user's browser directly to Meta and Google's servers.

49.    The Tracking Tools individually and collectively track and disclose to the Unauthorized Third-Party Marketers what a user communicates to Defendant on its website.[10]

50.    Notably, transmissions only occur on webpages that contain Tracking Tools.[11] Thus, Plaintiffs' and Class Member's Private Information would not have been disclosed to the

---

[10] Amrita Singh, *Comparing Google Analytics vs Facebook Pixel*, Boltic, https://www.boltic.io/blog/google-analytics-vs-facebook-pixel#:~:text=Google%20Analytics%20is%20a%20comprehensive,time%20on%20site%2C%20and%20conversions.&text=On%20the%20other%20hand%2C%20Facebook,user%20actions%20on%20your%20website. (last visited Jan. 24, 2026)

[11] Defendant's Google Analytics tool stores a client ID in a first-party cookie named _ga (also identified as a cid) to distinguish unique users and their sessions on your website. Analytics doesn't store the client ID when analytics storage          is          disabled          through          Consent          Mode."

**CLASS ACTION COMPLAINT**

Unauthorized Third Parties but for Defendant's decisions to install the Tracking Tools on its Website.

51.    Here, the Tracking Tools follow the user across the Website documenting and disclosing the user's journey, including browsing activity on the homepage, payment pages, patient resources, portal pages, appointment and form pages, contact pages, provider pages, and service pages that reveal the user's relationship with Crouse and interest in medical care.

52.    The Tracking Tools further capture and disclose sensitive URL structures and page titles associated with payment, portal, appointment, form, provider and service pages, which are transmitted to tracking platforms and reveal patient status or interest in medical care.

53.    The Tracking Tools allow unauthorized third parties to intercept the contents of patients' communications, receive and view patients' Private Information, mine it for purposes unrelated to the provision of healthcare, and further monetize it to deliver targeted advertisements to specific individuals. Upon information and belief, the web user activity is monetized through building audience profiles and campaigns from the user's specific activity on the Website. The digital marketing activity was likely deployed through the use of Meta Business Suite tools, and similar concepts on the other platforms to allow for retargeting of web users and building and targeting look-a-like audiences from that web user data. At no time, did Defendant obtain expressed, or even implied, consent to utilize and monetize the user and their patients' Private Information for marketing purposes.

54.    In this case, Defendant deployed Tracking Tools, including the Meta Pixel and Google Analytics tool, to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private

---

https://support.google.com/analytics/answer/11593727?hl=en#:~:text=Google%20Analytics%20
stores%20a%20client,is%20disabled%20through%20Consent%20Mode. (last visited Jan. 26, 2026).

**CLASS ACTION COMPLAINT**

Information to Meta and Google.

55.    Defendant's Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Meta and Google. These transmissions occur contemporaneously, invisibly, and without the patient's knowledge.

56.    Thus, without its patients' consent, Defendant has effectively used its source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Meta and Google, and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

57.    The Tracking Tools then allow Defendant to optimize the collection and aggregation of the patient web data to then deliver ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs.

58.    Because these identifiers remain in the data flow, Crouse's transmissions categorically fail the Safe Harbor method in §164.514(b)(2) and therefore remain protected PHI through the entire collections, disclosure, and marketing utilization process.

59.    As explained below, these unlawful transmissions and data misuses are initiated by Defendant's source code concurrent with communications made via certain webpages.

B.    **Defendant's Tracking Tools Disseminate Patient Information on Every Page of Its Website**

60.    Defendant utilized various Tracking Tools sitewide, including:

a.    **Meta Pixel ID: 1116286025180357 and 143391936290726** was capturing and disclosing a user's page views and navigation on every page of the Website sending to Meta (facebook.com/tr) full page URL and a persistent

fbp browser ID and other identifiers allowing Meta to re-identify the user with the browsing activity.

b. **Google Analytics 4 (GA4); Property ID: G-XNK6HRHQX9**; the tracking was present on all pages including page titles including page URLs, user engagement events, and page view event; the tracking included session IDS, browser fingerprinting metrics, and other identifiers allowing Google to re-identify the user with the browsing activity.

c. **Google Tag Manager (GTM): Container ID: GTM-5FG2JDT** was the central dispatcher for GA4, UA, Google Ads, DoubleClick Floodlight, and Google Remarketing and webform interactions tracking across the entire website. GTM may also have been dispatcher for other Tracking Tools.

61. In sum, when a user visited Defendant's Website, the Unauthorized Third-Party Marketing companies each received transmission of full URLs that contained specific fertility treatment information from which medical inferences could be easily drawn, for example:

a. Services/breast-health-center-breast imaging/ — reveals treatment for breast imaging
b. /services/neuroscience/neurovascular-neurosurgery/ — reveals neurological condition
c. /?s=neurology/ — reveals search for condition or physician related to neurology

62. GA4 and UA tools specifically transmitted highly sensitive page titles containing specific patient-linked PHI.

### *i.* HOMEPAGE TRACKING LINKED TO RE-TARGETING

63. Some specific examples of the tracking illustrate the privacy violations. Starting with the main entry point for Crouse website at www.crouse.org, visitors arrive here when searching for hospitals or follow-up treatment, evaluating treatment options, and searching for doctors.

64. Upon navigation to the homepage, the following tracking occurs:

**CLASS ACTION COMPLAINT**

- **Facebook Pixel** – Sends PageView event to facebook.com/tr with the homepage URL and persistent fbp=fb.1.1780064057833.782201183642654316
- **Google Ads Remarketing** – Sends remarketing hit to googleads.g.doubleclick.net with auid=1134872568.1780064058
- **Google Tag Manager** – Container GTM-5FG2JDT orchestrates all tags

65.     Although the homepage does not explicitly name a specific condition, it establishes that the user has visited a hospital's website. Both Google and Facebook receive the homepage URL along with persistent identifiers, allowing Defendant the ability to engage in long-term tracking of visitors who may already be patients or are further treatment options. In other words, the user activity is being tracked in order to then monetize the data by using it as the foundation for building retargeted marketing without consent.

| ▼ General | |
|---|---|
| Request URL | https://www.google.com/ccm/collect?rcb=10&frm=0&ae=g&auid=1134872568.1780064058&dt=Home%20%7C%20Crouse%20Health%2C%20Syracuse%2C%20New%20York&dl=https%3A%2F%2Fwww.crouse.org%2F&dr=www.crouse.org&scrsrc=www.googletagmanager.com&rnd=651987470.1782359248&navt=r&npa=0&_tu=CA&gtm=45be66n1v9210586194z879638673za20gzb79638673zd79638673xea&gcd=13l3l3l3l1l1&dma=0&tag_exp=115938465~115938468~119027224~119576891~119576895&apve=1&apvf=f&apvc=0&tids=AW-793282892&tid=AW-793282892&tft=1782359247865&tfd=2087&fmt=8 |
| Request Method | POST |
| Status Code | 🟢 200 OK |
| Remote Address | 142.251.155.119:443 |
| Referrer Policy | strict-origin-when-cross-origin |

*Figure 1. Screenshot from 2026 showing persistent google tracker on homepage indicating that the user visited the homepage, and the location of the hospital – Syracuse, New York.*

66.     A sample of Google Ads remarketing as a specific result of Crouse's use of Tracking Tools can be seen in the following code excerpt:

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/724828165/?random=2081834026&cv=9&fst=1782359247737&num=1&npa=1&label=we66CL_w0oIYEIWA0NkC&guid=ON&resp=GooglemKTybQhCsO&eid=375603261%2C466465925%2C512247839%2C658953496&u_h=1080&u_w=1920&ig=1&auid=1134872568.1780064058&frm=2&url=https%3A%2F%2F9527920.fls.doubleclick.net%2Factivityi%3Bdc_pre%3DCKuKxc69oZUDFdE0aAgdIu4ouQ%3Bsrc%3D9527920%3Btype%3Dinvmedia%3Bcat%3Ddbm_c0%3Brcb%3D9%3Bord%3D6857035906919%3Bnpa%3D0%3Bauiddc%3D1134872568.1780064058%3Buaa%3Darm%3Buab%3D64%3Buafvl%3DChromium%253B148.0.7778.179%257CGoogle%252520Chrome%253B148.0.7778.179%257CNot%25252FA)Brand%253B99.0.0.0%3Buamb%3D0%3Buam%3D%3Buap%3DmacOS%3Buapv%3D26.5.0%3Buaw%3D0%3Bpscdl%3Dnoapi%3Bfrm%3D0%3B_tu%3DKFA%3Bgtm%3D45fe66n1v9189728823z879638673za200zb79638673zd79638673xea%3Bgcd%3D13l3l3l3l1l111%3Bdma%3D0%3Bdc_fmt%3D2%3Btag_exp%3D0~115938465~115938469~119027224%3Bepver%3D2%3Bdc_random%3D17823&ref=https%3A%2F%2

**CLASS ACTION COMPLAINT**

Fwww.crouse.org%2F&top=https%3A%2F%2Fwww.crouse.org%2F&capi=1&hn=www
.googleadservices.com&fmt=3&ct_cookie_present=false&crd=CLTesQII8t-
xAgit4bECCK_hsQIIobixAgixwbECCLDBsQIIscOxAgiKxbECCMLJsQIIyeWxAgi0xr
ECCJPasQII29yxAgiH27ECCNPFsQII68yxAgjtzrECCNXPsQII9NqxAgjL47ECCK7ls
QIIyeOxAgiX1LECCMnbsQIIzeaxAgix4bECCLPhsQIIpt2xAgiw3rECCIDbsQJKLG5v
dC1uYXZpZ2F0aW9uLXNvdXJjZSwgdHJpZ2dlciwgZXZlbnQtc291cmNlWgMKAQFi
BAoCAgM&cerd=CgjZib4t36u-
LQ&fsk=ChEI8IDu0QYQx8XWieWYrKeSARIsABgQYc1iEebcZD5peetJn-QpM-
HwFXpqUV2G2XE00xM_tXpRUaSly_HlSaUaAr5P&pscrd=IhMIs5TMzr2hlQMV1W9
HAR1dyw3UOiRodHRwczovLzk1Mjc5MjAuZmxzLmRvdWJsZWNsaWNrLm5ldC9C
V0NoQUk4SUR1MFFZUXRMdk8zOHVKaGZNZ0VpMEF4a0pvcFFjWmdMLUZLRz
VKSE0zTmRuMWZ0el95MTV2WFRiZVBDUVNubDdWUHBqMzJFNy1EaEZuc1RO
TXoMCAliCAgAEAAYACAA

67.    In this script, upon visiting the home page, the google double click ads were triggered to send an advertisement to the specific user. This script demonstrates that Crouse flags every homepage visitor as part of a Google Ads remarketing audience demonstrating the intentional use of patient data for the re-marketing of reproductive health provider visits.

## ii.    BILL PAY TRACKING

68.    For all patients, https://www.crouse.org/pay-my-bill/ allows patients to pay their bill. Transmission of a patient's interaction and use of this page is indicative of an established patient relationship with Crouse.  Tracking of the data and transmission of user activity confers protection information related to patient status.

69.    The following specific tracking was transmitting PHI in the form of billing activity and patient status to the Unauthorized Third-Party Marketers:

a.    **Facebook Pixel** – PageView event with with persistent fbp pixel

b.    **GA4 & UA** – user_engagement and pageview events with page title "Pay-My-Bill";

c.    **Google Ads Remarketing** – Remarketing hit from the pay-bill page

d.    **GTM** – Active container events tracking bill pay



*Figure 2. Screenshot from 2026 showing tracking pixels triggered upon visiting the "Pay-My-Bill" page*

### iii.    TRACKING AFFORDING TREATMENT PAGE

70.    If a patient uses the Website to search for a treatment or physician, that information is automatically sent to Google and other third parties via Defendant's Tracking Tools. For example, if you search "I need a neurologist," the website populates with a URL containing the exact terms of your search which is then transmitted to Google.



**CLASS ACTION COMPLAINT**

*Figure 3. Screenshot from 2026 where someone searched "I need a neurologist" and the URL populated with the search terms.*

71. Following this search, the website sets off a variety of beacons ot Google, unbeknownst to patients, including retargeting for "neuroscience" and "neurology" despite the fact that those were not the exact terms of the search.

```
:authority        www.google-analytics.com
:method           POST
:path             /g/collect?v=2&tid=G-
                  XNK6HRHQX9&gtm=45je66n1v870824972z879638673za20gzb79638673zd79638673&_p=1782359247363&gcd=13l3l3l3l
                  1l1&npa=0&dma=0&_eu=AAAAAAQC&are=1&cid=264537678.1780064058&frm=0&pscdl=noapi&rcb=5&sr=1920x1080&uaa
                  =arm&uab=64&uafvl=Chromium%3B148.0.7778.179%7CGoogle%2520Chrome%3B148.0.7778.179%7CNot%252FA)Brand%3
                  B99.0.0.0&uam=&uamb=0&uap=macOS&uapv=26.5.0&uaw=0&ul=en-
                  us&_s=1&tag_exp=0~115938465~115938468~119027224&sid=1782358352&sct=4&seg=1&dl=https%3A%2F%2Fwww.crou
                  se.org%2F&dr=https%3A%2F%2Fwww.crouse.org%2Fservices%2Fneuroscience%2Fneurology%2F&dt=Home%20%7C%20
                  Crouse%20Health%2C%20Syracuse%2C%20New%20York&en=page_view&tfd=6977
                  https
```

72. Thus, without alerting the user, Defendant's Tracking Tools send each and every communication the user made via the webpage to Google, and the images below confirm that the communications Defendant sends to Google contain the user's Private Information.

73. The first line of highlighted text, "tid:G-XNK6HRHQX9" refers to Defendant's Google Analytics ID and confirms that Defendant has downloaded Google Analytics into its Source Code for this particular webpage.

74. The additional lines of highlighted text show Defendant has disclosed to Google that the user: (1) is a patient seeking neurology; and, (2) includes the CID that identifies the user based on their Google Account.

75. In each of the examples above, the user's website activity and the contents of the user's communications are sent to Google alongside their personally identifiable information. Several different methods allow marketers and third parties to identify individual website users, but the examples above demonstrate what happens when the website user is logged into their Google account on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Tracking Tool. For example, the

**CLASS ACTION COMPLAINT**

Tracking Tool transmits the user's CID and allows Google to link the user's online communications and interactions to their individual Google Account.

**C.    *Google Tools- PHI Disclosed & Exchanged for Targeted Advertising***

76.    Defendant and Google collected vast quantities of Plaintiffs' and Class Members' Private Information through both GA4, Google Ads / Display & video 360, DoubleClick Floodlight, Google Remarketing, and Google Tag Manager by tracking what every user communicated to Defendant's Website.[12]

77.    The Website was configured with Google Analytics 4, Google Ads / Display & Video 360, DoubleClick Floodlight, Google Remarketing, and Google Tag Manager, allowing for tracking across the various pages on the Website and retargeting advertisements.

78.    As Plaintiffs and Class Members navigated the Website, Google Analytics recorded the exact page and title viewed, and Google Ads would fire conversion trackers marking the user as a potential patient.

79.    As discussed above, Defendant's Source Code configured with GA4, Google Ads / Display & video 360, DoubleClick Floodlight, Google Remarketing, and Google Tag Manager manipulated Plaintiffs' and Class Members' browsers by secretly instructing them to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Google. These transmissions also occurred contemporaneously, invisibly, and without Plaintiffs' or Class Members' knowledge.

80.    As Plaintiffs and Class Members navigated the Website, Google's tools would send events to its servers containing: page titles, full URLs, engagement information, form or portal

---

[12] Amrita Singh, *Comparing Google Analytics vs Facebook Pixel*, Boltic (Nov. 17, 2022), https://www.boltic.io/blog/google-analytics-vs-facebook-pixel.

interactions, and permanent or semi-permanent tracking IDs linking the user to prior and future visits.

81.    Google uniformly stored a unique identifier in its logs for each Plaintiffs and Class Member, whether in private browsing mode or non-private browsing mode. The unique identifier can then be used to connect the individual with the collected browsing activities on that Website. Google then uses the identifiable behavioral data for serving personalized ads.[13]

82.    If the Plaintiffs or Class Member was logged in to their Google accounts while navigating the Website, Google's logs would include an additional identifier to further match an individual's browsing activities for additional tracking to serve personalized ads.[14]

83.    To be sure, Defendant and Google tracked Plaintiffs and Class Members with persistent IDs through Google Analytics 4, Google Ads / Display & video 360, DoubleClick Floodlight, and Remarketing when they visited the Website.

84.    As a direct result, Defendant disclosed confidential communications and PHI to Google in the forms of page views and events relating to the past, present and future medical care of Plaintiffs' and Class Members. Without discovery, Plaintiffs are unable to know precisely the configuration in the Google Tag Manager Container or to determine precisely what form content and fields may also have been disclosed.

---

[13] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees). Google also connects user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates", HHS, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Dec. 20, 2023) ("Such PHI may include, for example, an individual's IP address . . .").

[14] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, FN11 (Google employee deposition testimony explaining how Google tracks user data).

**CLASS ACTION COMPLAINT**

85.     At a minimum, Defendant disclosed sufficient Private Information from which Google could infer Plaintiffs' and Class Members' patient status

86.     By installing and implementing Google Analytics, Defendant caused Plaintiffs' and Class Member's communications to be intercepted by and/or disclosed to Google and for those communications to be personally identifiable.

87.     Due to the vast network of information held by Google and its highly sophisticated algorithm, Google can easily and reliably match the IP addresses, device information, and the unique identifiers to connect an individual with the tracked browsing activity.

88.     Google then utilizes such information to design and offer tailored marketing products such as Google Ad Words, which can be used for targeted advertising on those individuals.

89.     Defendant gained access to and utilized these powerful and valuable retargeting products in exchange for Plaintiffs' and Class Members' Private Information.

### D.  *Meta Pixel- Business Suite – PHI Disclosed & Exchanged for Targeted Advertising*

90.     Defendant and Meta collected vast quantities of Plaintiffs' and Class Members Private Information through the Meta Pixel.

91.     The Meta Pixel is a specific type of tracking pixel that connects a web user's browsing activity directly to the Meta advertising ecosystem (Facebook and Instagram). It offers highly valuable and effective integration between the data collected on a website with advertising campaigns through Meta platforms that include Meta Business Suites and Meta Ads Manager.

92.     By installing and implementing the Meta Pixel, Defendant caused Plaintiffs' and Class Member's communications to be intercepted by and/or disclosed to Meta and for those communications to be personally identifiable.

93.     After intercepting and collecting the Private Information, Meta processes the data, analyzes it, segments and assimilates it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Meta will associate the collected information with a

**CLASS ACTION COMPLAINT**

Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

94.     In addition to Website analytics, Meta Pixel created value for the Defendant by providing Defendant with access to sophisticated algorithms and computer learning (AI) tools that allowed the Defendant to further utilize Plaintiffs' and Class Members' behavioral data that was collected from the Website to build highly targeted audiences. These audiences include both custom audiences and look-a-like audiences.

95.     A "custom audience" is used to re-target users who have previously visited a website or taken specific actions on the website. For example, if a user visited Defendant's Website and didn't request an appointment, a custom audience could be built from the data gathered from the Meta Pixel to retarget those users with specific ads to try to get them to come back to the Website to schedule an appointment.

96.     A "look-a-like audience" is designed with the goal of reaching new potential customers who share similar characteristics, behaviors, and demographics as the existing high value customers tracked by the Meta Pixel. In this scenario, if Defendant wanted to target potential patients for hip replacement surgery, it could analyze, segment and use the data collected from patients who completed book an appointment forms for hip replacement surgery to build a look-a-like audience. That audience would then be used in combination with Meta's vast ecosystem and

advertising platform to get ads in front of individuals with the same or similar profiles as the current hip replacement patients of Defendant.

97.     The Meta Pixel further provides real time data to Meta's algorithms, allowing for automatic optimization of ad delivery. Meta's systems use the data provided from the Meta Pixel to learn and predict which users are more likely to convert and complete a request for appointment and will automatically target those potential patients to maximize the ad spend. In other words, the powerful Meta algorithm that has been gathering data from all aspects of the internet incorporates patient data from the Website to place digital advertisements in front of audiences with the greatest chance of becoming a new patient of Defendant. The per patient conversion cost is then expected to be far lower than if Defendant attempted to use less sophisticated and targeted forms of advertising like traditional media, where the ad impression cost is much higher and the cost to convert a patient is higher.

98.     Upon information and belief, Defendant was also aware of the Meta tools designed to transmit data directly to Facebook through the use of first-party cookies called Facebook's Conversions Application Programming Interface ("CAPI"), which is a server-to-server transmission.

99.     CAPI is another Facebook tool that functions as an alternative measure to circumvent any ad blockers or other denials of consent by the website user by transmitting information directly from Defendant's servers to Facebook's servers.[15, 16] Facebook markets CAPI

---

[15]Reggie Paquette, *What is the Facebook Conversions API and how to use it*, Birch (Mach 5, 2021), https://bir.ch/blog/facebook-conversions-api.

[16] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api (last visited Feb. 26, 2026).

**CLASS ACTION COMPLAINT**

as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[17]

100.    Defendant is in exclusive control over whether CAPI was implemented, but the availability of the Tool shows notice of the privacy concerns when utilizing the Meta Pixel.

101.    Moreover, while Defendant is in exclusive control of any audience marketing campaigns it built and utilized, the presence of targeted Facebook advertisements online indicates that Defendant was utilizing Meta Business tools to create audiences and monetize Plaintiffs' and Class Members browsing activity and Private Information collected from the Website.

102.    At a minimum, Defendant disclosed sufficient Private Information from which Meta could infer Plaintiffs' and Class Members' patient status.

### E. Defendant Was Enriched and Benefitted from the Use of the Tracking Technology and Private Information Had Financial Value

103.    The Tracking Tools served the sole purpose of bolstering Defendant's profits via marketing and advertising.

104.    In exchange for bartering away and disclosing the Private Information of its patients and customers, Crouse is compensated by Meta, Google, and the like in the form of enhanced advertising services and more cost-efficient marketing.

105.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Crouse re-targeted patients and potential patients.

---

[17]*About Conversions API*, Meta Business Help Center, https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Feb. 26, 2026).

**CLASS ACTION COMPLAINT**

106.    By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

107.    Crouse's disclosure of Private Information harmed Plaintiffs and Class Members. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is expected to continue to increase and estimates for 2022 were as high as $434 per user, constituting over $200 billion industry wide.

108.    The value of health data in particular is well-known. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data, observing that the market for this data is both lucrative and a significant risk to privacy.[18]

109.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[19] Accordingly, patient data that can be linked to a specific individual is even more valuable.

110.    There is also a market for data in which consumers can participate.  Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig*., 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy.  Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

---

[18] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/.

[19] *See* Christina Farr, *Hospital execs say they are getting flooded with requests for your health data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

**CLASS ACTION COMPLAINT**

111.    Several companies have products through which they pay consumers for a license to track their data.  Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

112.    Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[20]

113.    Personal information has private value beyond its use as a bare commodity.[21] The value of personal information is thus inherently related to the value of privacy, which is a question that has been researched in multiple fields including decision science, economics, information systems, management, health care, and marketing.[22] This research has approached the valuation of personal information from multiple perspectives:[23]

    a.    The amount one would accept to relinquish their data;

    b.    The amount one would spend to protect their data;

    c.    The potential harm from data exposure; and

    d.    The benefit a data holder could gain from acquiring data.

114.    These approaches can be used to establish a set of data points for the reasonable estimation of the value of personal information and non-public medical information such as patient status.

115.    In addition, numerous services exist that charge fees to monitor and remove personal information from data brokers and search databases. For example, Privacy Bee charges between $96 and $804 per year (depending on the features selected by the user).[24] Other similar services exist today, such as DeleteMe®, which removes information from all major data broker

---

[20] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data,* SECURELINK (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

[21] *See, e.g.*, Wagner, et. al (2018); Alessandro Acquisti et al, *The Economics of Privacy*, 54 JOURNAL OF ECON. LITERATURE 442 (2016); Xiao-Bai Li et al, *Valuing Personal Data with Privacy Consideration*, 52 DECISION SCI. 393 (2021).

[22] Fehrenbach David & Carolina Herrando, *The Effect of Customer-Perceived Value When Paying for a Product With Personal Data: A Real-Life Experimental Study*, 137 J. OF BUS. RES. 222 (2021); Xiao-Bai Li et al, *Valuing Personal Data with Privacy Consideration*, 52 DECISION SCI. 393 (2021); Alorwu, et al. (2024).

[23] Alessandro Acquisti, et al., *The Economics of Privacy*, 54 J. OF ECON. LITERATURE 442 (2016).

[24] *Pricing and License Cost*, PRIVACY BEE (last visited Aug. 26, 2025), https://privacybee.com/pricing/.

**CLASS ACTION COMPLAINT**

websites for $129 per year,[25] deleteme™ which charges one-time fees ranging from $100 to $500 for search engine and data breach removals,[26] and Incogni.com which charges between $95.88 (individual plan) and $275.88 (family plan) per year to remove information from major data broker websites and search databases[27] These provide a baseline market valuation of personal information.

### F. Data Broker Ecosystem

116.    Data brokers obtain large volumes of consumer information without consumer knowledge to resell the data for marketing campaigns. The FTC has investigated the practices and found that "data brokers collect and store billions of data elements covering nearly every U.S. consumer."[28]

117.    Data brokers combine online and offline data to markets to consumers online. Data brokers combine and analyze data about consumers to make inferences about them, including sensitive inferences related to health conditions.  Some data brokers have been found to store data indefinitely posing significant privacy risks. [29]

118.    Data brokers do not obtain the data directly from consumers, rather they obtain it through various sources including partnerships with third party marketers that utilize tracking tools.  While each data broker source may provide only a few data elements about a consumer's activities a data broker can combine the data sets to form a more detailed profile of the consumer's life.

119.    In fact, the unauthorized data collection from third party trackers, tags, and pixels has resulted in a proliferation and expansion of the data broker ecosystem.  The web trackers serve as pivotal components in the data broker ecosystem by facilitating the collection of online

---

[25]    *Privacy Protection Plans - JoinDeleteMe*, DELETEME® (last visited Aug. 26, 2025), https://joindeleteme.com/privacy-protection-plans/#2-years.

[26] *Services Pricing*, DELETEME™ (last visited Aug. 26, 2025), https://www.deleteme.com/pricing/.

[27] *About Us*, INCOGNI (last visited Aug. 26, 2025), https://incogni.com/about-us.

[28] https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-recommends-congress-require-data-broker-industry-be-more-transparent-give-consumers-greater (last visited Feb. 24, 2026)

[29] *Id*.

**CLASS ACTION COMPLAINT**

activities, preferences, and demographics. This aggregated data is then analyzed and sold to various entities interested in understanding consumer behavior and targeting specific demographics. [30]

120.    The U.S. data broker market is projected to from from $280.82 billion in 2023 to $382.16 billion in 2030. This expansion is largely driven through the data harvested from the pixels and trackers on the website.

121.    As far as medical advertising, the data brokers routinely utilize the data sets to predict which consumers are most likely to use, e.g., brand name medicine, order prescriptions by the mail, research medications online, or response to pharmaceutical ads or other treatment ads. These predictive models are then sold and used for targeted advertising.

122.    The lack of transparency in the data brokering ecosystem makes it unknown whether Meta and/or Google sold or traded any of the data they received through the Tracking Technology at issue.

123.    However, it is indisputable that the data at issue, given it is medical data, is highly valuable for segmentation and profile building.

124.    With Meta and Google tracking tools on sensitive pages of the Website, it is likely that the Private Information collected was also subsequently used or combined within the digital advertising and data-broker ecosystem.

125.    Once the data is shared and disclosed to any of the Unauthorized Third-Party Marketers, the Patients, Class Members, and Defendant lose control over its usage and distribution.

**G. Defendant Violated HIPAA and Industry Standards.**

126.    In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of Tracking Tools on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted
> to use tracking technologies in a manner that would result in

---

[30] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://lokker.com/wp-content/uploads/2024/04/LOKKER_Online-Data-Privacy-Report_032024-2.pdf

**CLASS ACTION COMPLAINT**

impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[31]

127. In other words, the HHS has expressly stated that entities who implement Tracking Tools, such as Defendant, have violated HIPAA Rules unless they have obtained a HIPAA-complaint authorization from their patients.

128. The HHS Bulletin further warns that:

While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[32]

129. In addition, HHS and the FTC have recently issued a letter, once again admonishing entities like Defendant to stop using Tracking Tools:

If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium. ***The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI. . .*** Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. . . As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app. The disclosure of such information without a consumer's authorization can, in some

---

[31] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 26, 2025) (emphasis added).
[32] *Id.*

**CLASS ACTION COMPLAINT**

circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[33]

130.    Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[34]

131.    The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[35]

132.    The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

133.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

134.    Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could

---

[33] *Re: Use of Online Tracking Technologies*, U.S. DEPT. OF HEALTH & HUM. SERVS. AND FED. TRADE. COMM'N (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf.
[34] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).
[35]    *HIPAA For Professionals*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (last visited Aug. 26, 2025), https://www.hhs.gov/hipaa/for-professionals/index.html.

be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

    e.    Names;
\*\*\*

    f.    Medical record numbers;

\*\*\*

    g.    Account numbers;

\*\*\*

    h.    Device identifiers and serial numbers;

    i.    Web Universal Resource Locators (URLs);

    j.    Internet Protocol (IP) address numbers; … and

    k.    Any other unique identifying number, characteristic, or code…; and" The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

135. The HIPAA Privacy Rule requires any "covered entity"—which includes healthcare providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

136. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d–1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained

**CLASS ACTION COMPLAINT**

by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

137. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

138. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

139. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[36]

140. In its guidance for Marketing, HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for

---

[36] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

**CLASS ACTION COMPLAINT**

marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[37]

141.    As alleged above, there is an HHS Bulletin that highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using Tracking Tools.[38]

142.    The Bulletin expressly provides that "[r]egulated entities are not permitted to use Tracking Tools in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

143.    Defendant's actions violated HIPAA Rules.

## H. IP Addresses, URLs, and Other Devices Identifiers Constitute Personally Identifiable Information.

144.    Crouse disclosed and otherwise assisted third parties with intercepting Plaintiffs' and Class Members' PHI that are uniquely linked to specific individuals.

145.    Each platform assigns a durable identifier ensuring the patient can be recognized on future visits across sessions and devices. These include:

| Safe Harbor Item | Evidence from Capture | Impact |
|---|---|---|
| **(M) Device identifiers / serials** | • Facebook_ fbp=fb.1.1778267298829.11415899977082205; issues the fbp browser ID that survives future visits<br>• GA4 records events through G-XNK6HRHQX9, session data, and engagement metadata<br>• Google Ads / Display & Video 360 issues advertising identifiers through AW-793282892 and DC-9527920 | Persistent device IDs survive across sessions, so the data set fails |

---

[37] *Marketing*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (rev. Apr. 3, 2003), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[38] *See See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH & HUMAN SERV. (rev. June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

**CLASS ACTION COMPLAINT**

| Safe Harbor Item | Evidence from Capture | Impact |
|---|---|---|
| | | Safe harbor; the persistent IDS allow for retargeting and audience building |
| **(N) Web URLs** | dl=https://crousemed.com/pay-my-bill/ | URLs reveal patient activity, provider searches, service interests, payment activity, or portal use, directly identifying healthcare context. |
| **(O) IP addresses** | Every HTTPS request to Facebook and Google includes the visitor's IP address (inherent in network requests) | IP transmission to third parties violates Safe Harbor unless removed or obfuscated. |

146.   In addition, an IP address is a number that identifies the address of a device connected to the Internet, and it is used to identify and route communications on the Internet.

147.   Internet service providers, websites, and third-party tracking companies use individual's IP addresses to facilitate and track Internet communications

**CLASS ACTION COMPLAINT**

148. Defendant used Google Analytics 4, Google Tag Manager, DoubleClick, Google Ads / Display & Video 360, Google Remarketing, and Meta Pixel tracking tools without anonymizing users' IP addresses.

149. Under HIPAA, an IP address is considered personally identifiable information:

150. Moreover, the intercepted communications contained numerous other direct and indirect identifiers. To be considered "de-identified", ALL of the 18 HIPAA Identifiers must be removed from the data set.

151. Consequently, Defendant unequivocally disclosed identifiable data, and Defendant's business practices violated HIPAA per se.

### i. Browser Finger-Printing

152. In addition to these personally identifiable persistent identifiers, upon receiving information from Defendant's Websites, Google also utilizes a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

153. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

154. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[39]

155. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs

---

[39] Justin Schuh, *Building a more private web*, GOOGLE, https://blog.google/products/chrome/building-a-more-private-web/.

**CLASS ACTION COMPLAINT**

much more subtle techniques.[40]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

156.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[41]

157.    Browser-fingerprints are personal identifiers. Google Analytics and other Google tracking tools can collect browser-fingerprints from website visitors.

158.    Without discovery and full disclosure of the complete source code, Plaintiffs cannot identify all browser fingerprint data at issue. Upon information and belief, additional data points were likely transmitted allowing for more accurate and identifiable fingerprinting.

## I.  Plaintiffs and Class Members Common Experiences

159.    Plaintiffs and Class Members are Defendant's patients who reside nationwide and received healthcare services from Defendant during the Class Period. Plaintiff T.J. has been Defendant's patient since 2022, and Plaintiff C.M. has been Defendant's patient since approximately 2016. As part of the medical services, Plaintiffs and Class Members used Defendant's Website to communicate Private Information to Defendant on numerous occasions. At all times, while using the Website, Plaintiffs and Class Members had an expectation of privacy that the Private Information provided to Defendant would remain private and confidential.

160.    Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

---

[40] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY, https://www.pixelprivacy.com/resources/browser-fingerprinting.

[41] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndsssymposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

**CLASS ACTION COMPLAINT**

161.    Plaintiffs and Class Members were not aware that their Private Information would be disclosed to the Unauthorized Third Parties and that Defendant was utilizing their Private Information for marketing purposes because Defendant did not acquire their consent.

162.    Plaintiffs and Class Members were Facebook, Instagram, Google, and/or other online account users.

163.    As Plaintiffs and Class members used Defendant's Website, the Website's Source Code configured with Tracking Tools sent a secret set of instructions back to the Plaintiffs' and Class Members' browsers, causing the Tracking Tools to uniformly send Plaintiffs' and Class Members' Private Information to the Unauthorized Third Parties.

164.    Accordingly, during the same transmissions, the Website routinely provided the Unauthorized Third-Party Marketers with digital identifiers allowing the Third Parties to connect the Plaintiffs and Class Members with their Private Information.

165.    Furthermore, following the disclosure, Plaintiffs and Class Members Private Information was aggregated and analyzed through the Unauthorized Third-Party Marketers analytics tools and reports.  From there, the aggregated data could be segmented and linked to specific user profiles for use in building "custom" and "look- a-like audiences" and was incorporated into the Unauthorized Third-Party Marketers algorithms for other avenues of re-targeting.

166.    Once released to the digital marketing ecosystem, the collected data may also be shared or combined with data broker aggregated data and profiles for additional marketing reach.

167.    Upon information and belief, Defendant monetized Plaintiffs' and Class Members' Private Information by building custom and look-a-like audiences to target and re-target patients and potential patients. By utilizing the Unauthorized Third Party Marketer's tools, Defendant was

**CLASS ACTION COMPLAINT**

able to save substantial marketing costs while increasing its cost per conversion, as well as likely increasing its overall new patient conversion.

### J.  Plaintiffs' Representative Website Experience

168.  Plaintiffs' experiences using the Website are representative of the Class they seek to represent.

169.  As a patient of Defendant since 2022, and with the encouragement of Defendant, Plaintiff T.J. accessed Defendant's Website on her computer and/or mobile device, including in 2025 to make a payment for a visit, for the purpose of finding and obtaining medical care, making payments, scheduling appointments, filling out forms, logging into the patient portal, requesting information, and viewing services, providers, symptoms, and related healthcare content.

170.  As Defendant's patient, Plaintiff T.J. reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to a third party or utilized for marketing purposes without her consent.

171.  Furthermore, at all times that she utilized the Website, Plaintiff T.J. was a New York resident and was logged into online accounts, including Facebook, Instagram, and Google/Gmail accounts.

172.  Plaintiff T.J. used Defendant's Website for a variety of medical services, and she visited one or more of the sensitive pages listed above that contained the Tracking Tools.

173.  Specifically, she submitted confidential medical information and engaged in confidential communications through Defendant's Website, including:

a.  Making payments for medical visits

b.  Scheduling appointments,

**CLASS ACTION COMPLAINT**

c.  Viewing services, providers, symptoms, and related healthcare information

d.  Requesting information

e.  Logging into the patient portal

f.  Filling out forms

g.  Entering personal and health-related information, including her name, email address, phone number, date of birth, insurance information, medical information, and appointment requests

h.  Later observing advertisements about Crouse or related services on Facebook, Instagram, Google, or other websites and apps

174.    Plaintiff C.M. has been a patient of Defendant and a user of Defendant's Website since approximately 2016, and he used the Website within the last few months.

175.    As a patient of Crouse, and with the encouragement of Defendant, Plaintiff C.M. frequently accessed Defendant's Website on his computer and/or mobile device, including in connection with his neurological care and an emergency room visit in or around May 2026, for the purpose of finding and obtaining medical care, making payments, scheduling appointments, filling out forms, logging into the patient portal, requesting information, and viewing services, providers, symptoms, and related healthcare content, including pages related to his neurologist.

176.    Plaintiff C.M. entered his personal and health-related information into the Website, including his name, email address, phone number, date of birth, insurance information, medical information, and appointment requests.

177.    At all times that Plaintiff C.M. utilized the Website, he was a New York resident and was logged into online accounts, including Facebook, Instagram, and Google/Gmail accounts.

**CLASS ACTION COMPLAINT**

178.    As Defendant's patient, Plaintiff C.M. reasonably expected that his online communications with Defendant were solely between himself and Defendant and that such communications would not be transmitted to or disclosed to a third party or utilized for marketing purposes without his consent.

179.    Following his visits to Defendant's Website, Plaintiff C.M. observed targeted advertisements about Defendant or related services on Facebook and other websites or apps.

### K.  Class Wide Injuries, Damages, and Remedies

180.    As a direct and proximate result of Crouse's conduct, Plaintiffs and Class Members have suffered numerous harms and injuries, including invasion of privacy, breach of fiduciary duty, breach of confidentiality, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy  and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

181.    Consequently, Plaintiffs individually and on behalf of the putative Class, bring this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiffs and the putative Class have suffered and seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), statutory damages, and in the alternative, nominal.

182.    Plaintiffs also seek consequential and future damage for reasonably and necessary data monitoring services including data broker and dark web monitoring, as well the cost of removing the disclosed data and profiles from data broker networks.

**CLASS ACTION COMPLAINT**

183. Plaintiffs further seek restitution, disgorgement of profits or cost savings obtained from the improper use and misappropriation of Plaintiffs' and Class Members' Private Information.

184. Finally, Plaintiffs seek injunctive relief to address the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

185. The injunctive relief sought includes:

    a. Removal of the Tracking Tools from sensitive parts of the Website;

    b. Deletion of all analytics data collected through the Tracking Tools that includes Private Information;

    c. Deletion of all audience profiles and campaigns built data gathered from the Tracking Tools and build from Plaintiffs' and Class Member's Private Information;

    d. Deletion of Plaintiffs' and Class Member data from all identifiable third party broker lists;

    e. Enjoinment from utilizing any of the Tracking Tools at issue in this matter in the future on any sensitive Website pages.

    f. Enjoinment from utilizing any other tracking technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with the third parties.

    g. Other relief as ordered by the Court.

**CLASS ACTION COMPLAINT**

## TOLLING

186. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that their PII and PHI was intercepted and unlawfully disclosed to Meta and Google because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

187. Class Definition: Plaintiffs bring this action on behalf of herself and other similarly situated individuals defined as follows:

> **Nationwide Class:** United States citizens who, during the class period, used Defendant's Website and had their Private Information disclosed as a result of using the Website.

188. Plaintiffs reserve the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

189. The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

190. Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

191. **Numerosity/Ascertainability.** Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs currently. However, it is estimated that there are thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendants' business records.

192.    **Typicality.** Plaintiffs' claims are typical of the claims of the Class because Plaintiffs used Defendants' Website and had their personally identifiable information and protected health information disclosed to third parties such as Google without their express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of other Class Members.

193.    **Adequacy.** Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests coincide with, and are not antagonistic to, those of the Class Members.  Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

194.    **Common Questions of Law and Fact Predominate/Well Defined Community of Interest**. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct.  The following questions of law and fact are common to the Class:

    a.   Whether Crouse intentionally tapped the lines of internet communication between patients and their medical providers;

    b.   Whether the Website surreptitiously tracked PII, PHI, and related confidential communications and simultaneously disclosed that Private Information to Meta and Google;

    c.   Whether Meta and Google are  third-party eavesdroppers;

    d.   Whether Crouse's disclosures of PII, PHI, and related confidential communications constitute an affirmative act of communication;

    e.   Whether Crouse's conduct, which allowed third parties to view, collect, aggregate, and monetize Plaintiffs' and Class Members' PII and PHI, resulted in a breach of confidentiality;

**CLASS ACTION COMPLAINT**

f.  Whether Crouse violated Plaintiffs' and Class Members' privacy rights by using Tracking Tools to communicate patients' Private Information to Meta and Google;

g.  Whether Crouse violated Plaintiffs' and Class Members' privacy rights by using Plaintiffs' and Class Members' Private Information in marketing tactics and campaigns without Plaintiffs' and Class Members' expressed written consent.

h.  Whether Crouse violated HIPAA by failing to obtain expressed written consent from Plaintiffs and Class Members before disclosing and using the Private Information for marketing purposes;

i.  Whether Plaintiffs and Class Members are entitled to statutory damages under the ECPA, CIPA and other relevant statutes;

j.  Whether Plaintiffs and Class Members are entitled to restitution or disgorgement of profits from the unauthorized use of their Private Information for marketing purposes;

195.  **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs are unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**CLASS ACTION COMPLAINT**

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF FIDUCIARY DUTY/CONFIDENTIALITY
**(On Behalf of Plaintiffs and the Nationwide Class)**

196. Plaintiffs repeat and reallege paragraphs 1 – 195 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

197. Medical providers have a duty of confidentiality to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

198. As a fiduciary of the Private Information and medical provider, Defendant further owed Plaintiffs and Class Members a duty of loyalty that precluded the misuse and misappropriation of Plaintiffs' and Class Members Private Information.

199. In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became a guardian of Plaintiffs' and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiffs and Class Members: (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; and (2) to only use the information for the authorized purpose.

200. Plaintiffs and Class Members had reasonable expectations of privacy in their Private Information and the related confidential communications exchanged with Defendant through the Website.

201. Plaintiffs and Class Members also reasonably expected that their Private Information would only be utilized for medical purposes.

**CLASS ACTION COMPLAINT**

202.    Plaintiffs and Class Members did not provide consent for Defendant to appropriate or use their Private Information for commercial and digital marketing purposes.

203.    Contrary to its duties as a fiduciary and medical provider and its express and implied promises of confidentiality, Defendant installed Tracking Tools with the intent and purpose to disclose and transmit Plaintiffs' and Class Members' Private Information to Google and Meta.

204.    The unauthorized disclosures of Plaintiffs' and Class Members' Private Information were intentionally caused by Defendant's employees acting within the scope of their employment with the purpose of marketing for new patients. Alternatively, the disclosures of Plaintiffs' and Class Members' Private Information occurred because of Defendant's negligent hiring or supervision of its employees, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees to properly discharge their duties under existing privacy policies and procedures.

205.    Defendant's breach of their fiduciary duties implied covenants of trust, loyalty, and confidence is evidenced by its failure to comply with federal and state privacy regulations, including:

   a.    Failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

   b.    Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

**CLASS ACTION COMPLAINT**

c. Failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d. Failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiffs' and Class Members PHI;

e. Impermissibly and improperly using and disclosing PHI for marketing in violation of 45 C.F.R. § 164.502, *et seq.*;

f. Failing to hire an expert to review the risk of data sets for re-identification and further failing to remove all digital identifiers from the data sets before disclosing the Private Information in violation of 45 C.F.R. § 160.103.

g. Failing to effectively train all members of its workforce, namely its digital marketing department and regulatory department on the policies and procedures with respect to PHI as necessary and appropriate for the members of its staff to carry out their responsibilities to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

h. Failing to keep Private Information confidential as required by N.Y. C.P.L.R. 4504;

i. Failing to keep Private Information confidential as required by N.Y. Pub. Health Law § 2803(3)(f);

j. By otherwise failing to safeguard Plaintiffs' and Class Members' Private Information; and

k. By otherwise misusing and unjustly profiting from Plaintiffs' and Class Member's Private Information.

**CLASS ACTION COMPLAINT**

206. As a direct and proximate result of Crouse's breach of fiduciary duty and confidentiality, Plaintiffs and Class Members have suffered numerous harms and injuries, including invasion of privacy, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

207. Consequently, Plaintiffs individually and on behalf of the putative Class, seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and in the alternative, nominal. Plaintiffs further seek restitution, disgorgement of profits or cost savings obtained from the improper use of the Private Information. Finally, Plaintiffs seek injunctive relief to address the ongoing breach of the fiduciary duty and financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

## COUNT II
### VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")
### 18 U.S.C. § 2511(1) *et seq.*
### UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE
### (On Behalf of Plaintiffs and the Nationwide Class)

208. Plaintiffs repeat and reallege paragraphs 1 – 195 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

209. The ECPA protects both sending and receipt of communications.

210. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

211. The transmissions of Plaintiffs' Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

- 49 -
**CLASS ACTION COMPLAINT**

212.    The transmissions of Plaintiffs' Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

213.    **Electronic Communications**. The transmission of Private Information between Plaintiffs and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

214.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

215.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

216.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.  Plaintiffs' and Class Members' browsers;

    b.  Plaintiffs' and Class Members' computing devices;

    c.  Defendant's web-servers; and

d.  The Pixel deployed by Defendant to effectuate the sending and acquisition of patient communications

217.    Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Pixel imbedded and ran on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiffs' and Class Members' electronic communications to third parties, including Facebook and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

218.    Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Pixel imbedded and ran on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiffs' and Class Members' electronic communications, for purposes other than providing health care services to Plaintiffs and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

219.    Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the source code it imbedded and ran on its web properties, contemporaneously and intentionally redirected the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

220.    Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiffs' and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

**CLASS ACTION COMPLAINT**

- 52 -

221. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

222. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

223. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiffs' and Class Members' PII and PHI for financial gain.

224. Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

225. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the Pixel tracking code.

226. Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

227. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, violations of the New York Patient's Bill of Rights, New York Public Health laws, and invasion of privacy, among others.

228. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

229. Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs 'and Class Members' Private Information does not qualify for the party exemption.

230. Defendant's acquisition of patient communications that were used and disclosed to the Unauthorized Third-Party Marketers was done for purposes of committing numerous criminal and tortious acts in violation of the laws of the United States and New York, including.

   a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

   b. Criminal violation of New York Computer Crime statutes, including: Unauthorized use of computer (N.Y. Penal § 156.05); Unlawful duplication (N.Y. Penal § 156.29); and Computer trespass (N.Y. Penal § 156.10);

   c. Violation of the New York Patient's Bill of Rights, N.Y. Pub. Health § 2803-c;

   d. Violation of law regarding New York Civil Practice Law and Rules § 4504;

   e. Violation of the New York Deceptive Trade Practices Act, Gen. Bus. Law § 349; and

   f. Invasion of Privacy.

231. First, under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

**CLASS ACTION COMPLAINT**

232. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

233. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

   a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

   b. Disclosed individually identifiable health information to Facebook and Google without patient authorization.

234. Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Tracking Tool source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

235. Second, under N.Y. Penal Law § 156.05, a person commits the offense of unauthorized use of a computer if he "knowingly uses, causes to be used, or accesses a computer, computer service, or computer network without authorization."

236. Defendant violated the N.Y. Penal Law § 156.05 in that Defendant knowingly used and accessed Plaintiffs' and Class Members' computing devices and data as part of a deception and without their authorization, including through placement of the fbp, ga, and gid cookies as well as use of source code that commanded Plaintiffs' and Class Members' computing devices to send identifiers and the content of communications with Defendant simultaneously to Defendant and Facebook, Google, and others.

237. Third, under N.Y. Penal Law § 156.29, a person commits the offense of unlawful duplication of computer related materials if he copies, reproduces or duplicates in any manner computer material that contains records of the medical history or medical treatment of an identified

or readily identifiable individual or individuals with an intent to commit or further the commission of any crime under this chapter.

238.    Defendant violated N.Y. Penal Law § 156.29 by exceeding its authorization to access Plaintiffs' and Class Members' computers including through placement of the fbp, ga, and gid cookies as well as use of source code that commanded Plaintiffs' and Class Members' computing devices to make unauthorized copies of Plaintiffs' and Class Members' electronic data and to send identifiers and the content of communications with Defendant simultaneously to Defendant and Facebook, Google, and others.

239.    Fourth, under N.Y. Penal Law § 156.10, a person commits the offense of computer trespass if he knowingly uses, causes to be used, or accesses a computer, computer service, or computer network without authorization and:

        a.  He or she does so with an intent to commit or attempt to commit or further the commission of any felony; or

        b.  He or she thereby knowingly gains access to computer material.

240.    Defendant violated N.Y. Penal Law § 156.10 when it knowingly and without Plaintiffs or Class Members' authorization inserted the fbp, ga, and gid cookies on Plaintiffs' and Class Members' computing devices.

241.    The fbp, ga, and gid cookies, which constitute programs, commanded Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

242.    Defendant knew or had reason to know that the fbp, ga, and gid cookies would command Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

243. Fifth, under New York's Rights of Patients in Certain Medical Facilities, N.Y. Pub. Health § 2803-c(3)(f), "[e]very patient shall have the right to have privacy in treatment and in caring for personal needs, confidentiality in the treatment of personal and medical records, and security in storing personal possessions."

244. Defendant violated the New York Rights of Patients by disclosing Plaintiffs' and Class Members' Private Information to third parties without authorization or consent.

245. Finally, under New York Civil Practice Law and Rules Section 4504, "[u]nless the patient waives the privilege" medical professionals are not "allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity."

246. Defendant violated N.Y. C.P.L.R. 4504 by disclosing Plaintiffs' and Class Members' Private Information to third parties without authorization or consent.

247. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their individually-identifiable patient health information on its Website, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' individually-identifiable patient health information with Facebook and Google, third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know were receiving their individually-identifiable patient health information, and that Plaintiffs and Class Members did not consent to receive this information.

248. Defendant accessed, obtained, and disclosed Plaintiffs' and Class Members' Private Information for the purpose of committing the crimes and torts described herein because it

**CLASS ACTION COMPLAINT**

would not have been able to obtain the information or the marketing services if it had complied with the law.

249.    As such, Defendants cannot viably claim any exception to ECPA liability.

250.    Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a.    Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually-identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiffs and the Class Members to suffer emotional distress;

b.    Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' individually-identifiable patient health information without providing any value or benefit to Plaintiffs or the Class Members;

c.    Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' individually-identifiable patient health information, such as understanding how people use its website and determining what ads people see on its website, building more reliable audiences, and running more efficient marketing campaigns without providing any value or benefit to Plaintiffs or the Class Members;

d.    Defendant has failed to provide Plaintiffs and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

**CLASS ACTION COMPLAINT**

e.  Plaintiffs' and Class Members' lost control and value of their PII and PHI due to Defendant utilizing their Private Information for marketing without their consent.

f.  Plaintiffs and Class Members are suffering ongoing financial harm derived from the continued interception and misuse of their Private Information.

251.    Plaintiffs, individually and on behalf of the putative Class, seek legal and equitable remedies to address and rectify the conduct described herein and are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (on behalf of Plaintiffs and the Nationwide Class)

252.    Plaintiffs repeat and reallege paragraphs 1 – 195 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

253.    As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiffs and the Class Members provided their Private Information.

254.    When Plaintiffs and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information or use it for non-medical purposes without consent.

255.    Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to maintain the confidentiality and limited scope of use.

256.    Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information to the Un-authorized Third-Party Marketers without consent.

257.    Defendant further breach the implied contracts by using Plaintiffs' and Class Members' Private Information without consent.

258.    As a direct and proximate result of Defendant's breach of these implied contracts, Plaintiffs and Class Members sustained numerous injuries including but not limited to the loss of the benefit of their bargain, invasion of privacy, loss of control of their Private Information, misappropriation and misuse of their Private Information, breach of confidentiality, conversion, and the ongoing financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

259.    Consequently, Plaintiffs, individually and on behalf of the putative Class seek legal and equitable remedies to address and rectify the breach of implied contract described herein including compensatory and consequential damages, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and in the alternative nominal damages. Plaintiffs further seek restitution, and disgorgement of profits or cost savings obtained from breach and the improper use of the Private Information. Finally, Plaintiffs seek injunctive relief to prevent the ongoing disclosure, interception, and continued misuse of the Private Information.

## COUNT IV
### UNJUST ENRICHMENT
**(On behalf of Plaintiffs and the Class)**

260.    Plaintiffs repeat and reallege paragraphs 1 – 195 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

261.    Defendant benefits from the use of Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at their expense.

**CLASS ACTION COMPLAINT**

262. Plaintiffs and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

263. Defendant exceeded any authorization given and instead consciously disclosed, misappropriated, and misused the Private Information for marketing and its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary savings and revenue.

264. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members for the use of the Private Information.

265. The financial benefits that Defendant derived from Plaintiffs and Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belong to Plaintiffs and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the savings, profit or other financial benefits wrongly derived from the misappropriation and misuse of Plaintiffs' and Class Members' Private Information as alleged in this Complaint.

266. Consequently, due to the unjust nature of Defendant's actions and the injuries and damages sustained by Plaintiffs and the Class, Defendant should be compelled to provide to disgorge into a common fund all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper. These equitable funds can be evenly allocated among the Plaintiffs and Class Members on a pro-rata basis.

**CLASS ACTION COMPLAINT**

267. Alternatively, Defendant should be compelled to provide restitution to Plaintiffs and Class for the fair market value of the Private Information that Defendant misappropriated and misused for marketing purposes without consent.

268. Furthermore, Plaintiffs seek injunctive relief to prevent the imminent financial and privacy harms arising from the ongoing disclosure, interception, and misuse Plaintiffs' and Class Member's Private Information.

**COUNT V**
**NEGLIGENCE**
**(Alternative Count)**
**(On behalf of Plaintiffs and the Class)**

269. Plaintiffs repeat and reallege paragraphs 1 – 195 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

270. In the alternative, Plaintiffs bring an action for negligence.

271. Defendant owed Plaintiffs and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information.

272. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed Tracking Technologies to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendant, including Private Information and the contents of such information.

273. These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

274. While Defendant intentionally implemented the Tracking Tools, Defendant was unaware of that the Tracking Tools were capable to collecting personally identifiable information that constituted personal health information.

**CLASS ACTION COMPLAINT**

275.    It was highly foreseeable that the worlds most sophisticated digital marketing companies at issue here would be able to connect the website data related to past, present, and future medical care with specific individuals.

276.    Defendant was negligent in one or more of the following ways:

    a.   Failed to hire outside experts to review the marketing plan to ensure all identifiers were removed;

    b.   Failed to remove all identifiers as advised by HIPAA regulations;

    c.   Failed to test its marketing systems for level of entropy that could be used to identify individuals;

    d.   Failed to adequately train its digital marketing team on data privacy standards and policies;

    e.   Failed to recognize the connection between its targeted marketing campaigns an ecosystem capable of identifying individuals who visited the Website;

    f.   Was otherwise negligent.

277.    As a direct and proximate result of Defendant's breach, Plaintiffs and Class Members sustained numerous injuries including but not limited to the, invasion of privacy, loss of control of their Private Information, misappropriation and misuse of their Private Information, breach of confidentiality, conversion, and the ongoing financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

278.    Consequently, Plaintiffs, individually and on behalf of the putative Class seek legal and equitable remedies to address and rectify the negligence described herein including compensatory and consequential damages, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and in the alternative nominal damages. Plaintiffs further

seek restitution and disgorgement of profits or cost savings obtained from the improper use of the Private Information. Finally, Plaintiffs seek injunctive relief to prevent the ongoing disclosure, interception, and continued misuse of the Private Information.

**COUNT VI**
**VIOLATIONS OF THE NEW YORK CONSUMER LAW FOR DECEPTIVE ACTS AND PRACTICES GEN. BUS. LAW § 349**
**(On behalf of Plaintiffs and the Class)**

279.   Plaintiffs repeat and reallege paragraphs 1 – 195 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

280.   This cause of action is brought pursuant to the New York General Business Law § 349 ("NYGBL"), which New York courts have invariably interpreted using the kind of liberal construction afforded to state consumer protection statutes intended to prevent fraud.

281.   NYGBL § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

282.   By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of NYGBL § 349. The conduct alleged herein is a "business practice" within the meaning of NYGBL § 349, and the deception occurred within New York State.

283.   By serving as Plaintiffs' and Class Members' healthcare provider, Defendant had a duty to protect their Private Information from unlawful disclosure.

284.   Plaintiffs and the Class Members paid for or otherwise availed themselves and received services from Defendant, for the purpose of medical treatment.

285.   Defendant engaged in the conduct alleged in this Class Action Complaint, entering into transactions intended to result, and which did result, in the provision of medical treatment to Plaintiffs and Class Members.

**CLASS ACTION COMPLAINT**

286.    Defendant's acts, practices, and omissions were done in the course of Defendant's offer of medical treatment, services, and care throughout the state of New York.

287.    The unfair, unconscionable, and unlawful acts and practices of Defendant alleged herein, and in particular the decisions regarding the Tracking Tools emanated and arose within the state of New York, within the scope of NYGBL § 349.

288.    Defendant, operating in and out of New York, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of NYGBL § 349, including but not limited to the following: (a) knowingly promising to protect Plaintiffs' and Class Members' Private Information, (b) knowingly and improperly storing, possessing, using, and/or procuring the interception of, Plaintiffs' and Class Members' Private Information; and (c) knowingly disclosing Plaintiffs' and Class Members' Private Information to third parties, including Facebook.

289.    Defendant committed these acts while concurrently representing that it would protect and not unlawfully disclose Plaintiffs' and Class Members' Private Information unless under a legal obligation to do so.

290.    These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including but not limited to HIPAA, the New York Patient's Bill of Rights, New York computer crime statutes, statutes regarding the confidentiality of medical records, and NYGBL § 349.

291.    Defendant knew or should have known that its Website and the cookies and source code thereon were unlawfully wiretapping, intercepting, and disclosing Plaintiffs' and Class Members' Private Information.

**CLASS ACTION COMPLAINT**

292.    Plaintiffs have standing to pursue this claim because as a direct and proximate result of Defendant's violations of NYGBL § 349, Plaintiffs and Class Members have been "aggrieved" by a violation of NYGBL § 349 and bring this action to obtain a declaratory judgment that Defendant's acts or practices violate NYGBL § 349.

293.    Plaintiffs also have standing to pursue this claim because, as a direct result of Defendant's knowing violation of NYGBL § 349, Plaintiffs and Class Members have lost money or property in the form of monies paid for Defendant's services, diminution in value of their Private Information, as well as loss of the benefit of their bargain with Defendant.

294.    Plaintiffs and Class Members are entitled to injunctive relief to protect them from the substantial and imminent risk of future loss of Private Information, including, but not limited to: (a) ordering that Defendant immediately remove any pixel, web beacon, cookie, or other tracking technology that causes the disclosure of Private Information to third parties without consent; (b) ordering that Defendant engage third-party security auditors and internal personnel to ensure Plaintiffs' and Class Members' Private Information is no longer subject to the unlawful practices described in this Complaint; (c) ordering that Defendant purge, delete, and destroy Private Information not necessary for its provisions of services in a reasonably secure manner; (d) ordering that Defendant conduct regular database scans and security checks; (e) ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to properly handle Private Information provided via Defendant's Website; (f) ordering Defendant to meaningfully educate individuals about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps victims should take to protect themselves.

**CLASS ACTION COMPLAINT**

295.    Plaintiffs bring this action on behalf of themselves and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiffs, Class Members, and the public from Defendant's unfair methods of competition and unfair, unconscionable, and unlawful practices. Defendant's wrongful conduct as alleged in this Class Action Complaint has had widespread impact on the public at large.

296.    The above unfair, unconscionable, and unlawful practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

297.    Defendant's actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

298.    Plaintiffs and Class Members seek relief under NYGBL § 349, including, but not limited to, a declaratory judgment that Defendant's actions and/or practices violate NYGBL § 349; injunctive relief enjoining Defendant, their employees, parents, subsidiaries, affiliates, executives, and agents from continuing to violate NYGBL § 349 as described above.

299.    Plaintiffs and Class Members are also entitled to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

**CLASS ACTION COMPLAINT**

A.    For an Order certifying the Class and appointing Plaintiffs and Counsel to represent such Class;

B.    For an award of damages, including, but not limited to, past and future compensatory, actual, consequential, statutory, and nominal damages, as allowed by law in an amount to be determined;

C.    For equitable relief in the form of restitution and disgorgement of profits;

D.    For injunctive relief requested by Plaintiffs, including, but not limited to:

     i.    Removal of the Tracking Tools from sensitive parts of the Website;

     ii.    Deletion of all analytics data collected through the Tracking Tools;

     iii.    Deletion of all audience profiles and campaigns built data gathered from the Tracking Tools;

     iv.    Deletion of Plaintiffs' and Class Member data from all identifiable third party broker lists;

     v.    Enjoinment from utilizing any of the Tracking Tools at issue in this matter in the future.

     vi.    Enjoinment from utilizing any other tracking technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with the third parties.

     vii.    Other injunctive relief as ordered by the Court.

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

**CLASS ACTION COMPLAINT**

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.

DATE: June 26, 2026                Respectfully Submitted,

                                   /s/ Leanna Loginov
                                   Leanna A. Loginov (NY Bar No. 5894753)
                                   Alexandra Mormile (NY Bar No. 5718259)
                                   **SHAMIS & GENTILE, P.A.**
                                   14 NE First Avenue, Suite 705
                                   Miami, Florida 33132
                                   T: 305-479-2299
                                   lloginov@shamisgentile.com
                                   amormile@shamisgentile.com

                                   Alex Honeycutt*
                                   **MILBERG PLLC**
                                   800 S. Gay Street, Suite 100
                                   Knoxville, TN 37929
                                   Tel: (865) 263-8384
                                   ahoneycutt@milberg.com


                                   Randi Kassan, Esq.
                                   **MILBERG PLLC**
                                   100 Garden City Plaza, Suite 408
                                   Garden City, NY 11530
                                   T: 516-741-5600
                                   Rkassan@milberg.com

                                   Joseph M. Lyon*
                                   Kevin Cox*
                                   **THE LYON FIRM, ALC**
                                   2754 Erie Ave.
                                   Cincinnati, Ohio 45208
                                   Phone: (513) 381-2333
                                   *jlyon@thelyonfirm.com*
                                   *cwatspm@thelyonfirm.com*

                                   ***Counsel for Plaintiffs and the Putative Class***

                                   * *pro hac vice* forthcoming

**CLASS ACTION COMPLAINT**